Paul DONALD, Plaintiff-Appellant,

v.

MADISON INDUSTRIES, INC., a corporation, et al., Defendants,

and

The United States of America, Defendant-Appellee.

No. 72-1879.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted May 21, 1973.

Decided Aug. 28, 1973.

Russ B. Anderson, Emporia, Kan., for plaintiff-appellant.

Roger K. Weatherby, Scott P. Crampton, Robert J. Roth, Meyer Rothwacks, Crombie J. D. Garrett, and Wesley J. Filer, Washington, D. C., for defendant-appellee.

Before LEWIS, Chief Judge, HOLLOWAY, Circuit Judge, and LARAMORE,* Senior Judge.

LARAMORE, Senior Judge.

The question presented by this appeal involves the relative priority of a Federal tax lien and a private security interest to the proceeds from the sale of certain property of a taxpayer-debtor, Madison Industries. Resolution of this question devolves to an interpretation and application of section 6323(c) of the Internal Revenue Code of 1954, as amended.

To the extent relevant herein, the facts disclose that in 1966, Madison Industries (taxpayer) borrowed $40,000 from First National Bank of Madison, Kansas (First National). As collateral for the loan, taxpayer executed a "security interest" in

> all inventory, accounts, machinery, equipment, finished products and products being manufactured. Also everything connected with said business in any way.

In November 1968, the 1966 First National note was transferred to Alliance Capital Corporation of Fort Worth, Texas (Alliance Capital). Because Alliance Capital extended additional credit to the taxpayer, a replacement promissory note and security agreement were executed

---

* Senior Judge Don N. Laramore of the United States Court of Claims is sitting by designation.

granting Alliance Capital a security interest in the following items:

All items of personal property, wherever situated, including, but not limited to: cars, trucks, inventory, accounts receivable, equipment used in connection with manufacturing, tools, finished products, work in process, now owned or purchased as a replacement, or purchased as new equipment in the future. This is intended to cover everything owned by this business in any fashion.

Thereafter, these security agreements were assigned to Paul Donald, plaintiff-appellant. On December 12, 1969, the Internal Revenue Service filed its first notice of tax liens against the taxpayer in the appropriate state and local offices. In July, August and September of 1970, First National made additional loans to the taxpayer based on new security agreements, which were ultimately assigned to Donald in September, 1971. The government seized all of the taxpayer's property on September 9, 1970, but three days later released all of it back to the taxpayer, except for six trailers (five manufactured by taxpayer and one trade-in) and one pick-up truck.[1]

In November 1970, Donald initiated the present action in the District Court of Lyons County, Kansas, seeking to enjoin the United States from disposing of the taxpayer's assets then in possession of the Internal Revenue Service. The United States removed the action to the United States District Court and filed a cross-complaint asking for an adjudication of the relative priorities of the various liens on taxpayer's property. By agreement between the parties, the assets in issue were sold at a private sale and the $11,000 proceeds deposited in the Court Registry. From a decision in favor of the United States, Donald has prosecuted the present appeal.

■ The lower court found the basic issue herein to be whether the appel-

lant's security interest was "choate" at the time the Federal tax liens were filed. Pursuant to a thesis tendered by the government, resolution of this "choateness" issue was seen as being dependent on whether the property subject to the security agreements was described with sufficient "specificity," i. e., was it "identifiable." Based in part on an interpretation of Illinois v. Campbell, 329 U.S. 362, 67 S.Ct. 340, 91 L.Ed. 348 (1946), the District Court concluded that the security agreement's coverage of "finished goods" was not sufficiently specific, since that description encompassed a class of goods which was constantly changing and only identifiable at some particular point in time. As a result, the security interest was found to be "inchoate," and thus inferior to the Federal tax lien in priority.

A review of the pertinent Federal law in this area convinces us that we must reject as inappropriate and out-of-date the legal criteria advanced by the government and adopted by the lower court for resolution of the lien priority issue presented herein. While we do not find the "choateness doctrine" totally obsolete, it appears that the government would have us revitalize the doctrine to its pristine form by completely ignoring the Federal Lien Act of 1966, and emasculating significant elements of section 6323 which were specifically designed to alter the effects of said doctrine.[2] We cannot concur in such a scheme.

Moreover, even if this case had arisen prior to the Federal Lien Act, we would harbor grave doubts as to whether the choateness doctrine would have dictated the degree of specificity which the government would have us find. Our dubiousness stems from the government's reliance on the "specificity" criteria in Illinois v. Campbell, *supra*, a case arising under the Federal insolvency priority statute, R.S. § 3466, which was later construed as giving virtually absolute

---

1. By stipulation between the parties, Donald has abandoned his claim to the proceeds from the truck.

2. All section references herein are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.

priority to Federal liens in insolvency situations, unless the secured party had already gained either possession or title to the property. United States v. Gilbert Associates, 345 U.S. 361, 73 S.Ct. 701, 97 L.Ed. 1071 (1953). Appellee correctly points out that United States v. Security Trust and Savings Bank, 340 U.S. 47, 71 S.Ct. 111, 95 L.Ed. 53 (1950), also applied the general choateness doctrine to a case involving the predecessor tax lien priority statute, and in United States v. R. F. Ball Construction Co., 355 U.S. 587, 78 S.Ct. 442, 2 L.Ed.2d 510 (1958), it was established that the doctrine is also applicable to a consensual lien created by contract between the parties.

However, the government fails to note that in United States v. Vermont, 377 U.S. 351, 84 S.Ct. 1267, 12 L.Ed.2d 370 (1964), the Supreme Court explicitly held that the degree of "specificity" required under the Federal tax lien provisions is not as great as that which is necessary in cases involving insolvent debtors under R.S. § 3466—such as Illinois v. Campbell, *supra*. In fact, it was held in *Vermont* that to be choate a state lien need not attach to specifically identified portions of a taxpayer's property, as it must in the case of a lien on an insolvent debtor, but instead may cover "all property and rights to property, whether real or personal, belonging to such [taxpayer]." 377 U.S., at 352, 84 S.Ct., at 1267. Since this all-encompassing description was found sufficient to establish the identity of the property subject to the lien for purposes of the choateness doctrine in. *Vermont,* we fail to see how the descriptions herein, "finished goods" (among others), could be faulted as being too broad or unspecific.

In any event, we no longer need rely solely on *Vermont* and its predecessors to light the way, for Congress provided us with new guide posts in the Federal Lien Act of 1966. Section 6323 deals generally with the "validity and priority [of Federal tax liens] against certain persons," while subsection (c) specifically addresses itself to "protection for certain commercial transactions financing agreements." Section 6323(c)(1) provides, in pertinent part, that:

> * * * even though notice of a lien imposed by section 6321 has been filed, such lien shall not be valid with respect to a security interest which came into existence after tax lien filing but which—(A) is in qualified property [defined in (c)(2)(B)] covered by the terms of a written agreement entered into before tax lien filing and constituting—(i) a commercial transactions financing agreement [defined in (c)(2)(A)] * * * and * * * (B) is protected under local law against a judgment lien arising, as of the time of tax lien filing, out of an unsecured obligation.

For purposes of sections 6323 and 6324, section 6323(h)(1) defines a "security interest" as meaning:

> * * * any interest in property acquired by contract for the purpose of securing payment or performance of an obligation or indemnifying against loss or liability. A security interest exists at any time (A) if, at such time, the property is in existence and the interest has become protected under local law against a subsequent judgment lien arising out of an unsecured obligation, and (B) to the extent that, at such time, the holder has parted with money or money's worth.

Subsection 6323(c)(2)(B) states, that the "term 'qualified property,' when used with respect to a commercial transactions financing agreement, includes only commercial financing security [collateral] *acquired by the taxpayer before the 46th day after the date of tax lien filing,*" (emphasis added). "Commercial financing security" (collateral) is defined by subsection 6323(c)(2)(C) as including "inventory," which the committee reports state "include raw materials and goods in process as well as property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." H.R. Rep.No.1884, 89th Cong., 2d Sess. 41

(1966), reprinted at 1966–2 Cum.Bull. 844.

Subsection 6323(c)(2)(A) defines a "commercial transaction financing agreement," as relevant herein, as "an agreement (entered into by a person in the course of his trade or business)—(i) to make loans to the taxpayer to be secured by commercial financing security [here, inventory] acquired by the taxpayer in the ordinary course of his trade or business, * * * but such an agreement shall be treated as coming within the term only to the extent that such a loan or purchase [made pursuant to the agreement which was entered into before tax lien filing] is made before the 46th day after the date of tax lien filing or (if earlier) before the lender or purchaser had actual notice or knowledge of such tax lien filing."

■ In addition, subsection 6323(i) (2) provides, as interpreted by the committee reports, that "[i]f local law permits one person to acquire by substitution the rights of another with respect to any lien or interest dealt with here, then the person substituted is to stand in the shoes of the person he replaces with regard to Federal tax liens." H.R.Rep.No.1884, *supra*; (1966–2 Cum. Bull. 823). Thus, the rules set out above are applicable to appellant even though the original security agreements were between the taxpayer and First National and Alliance Capital, as long as his substitution was valid under local law. The government has not suggested that it was not.

■ Summarizing the foregoing definitions and rules as applicable herein, it is apparent that the appellant's security interest will take priority over the filed Federal tax lien if the following requisites are met:

1. The "security interest" stems from a written agreement which
 (a) was entered into before the Federal tax lien was filed, and
 (b) qualifies as a "commercial transactions financing agreement" under section 6323(c)(2)(A)(i);

2. The loans were made pursuant to the written agreement within 45 days of the tax lien filing or prior to receiving actual notice or knowledge that the tax lien had been filed, i. e., disbursements or loans after receipt of actual notice or 45 days, whichever is sooner, are unprotected;

3. The written agreement covered "qualified property"—here inventory—which was "acquired" by the taxpayer within 45 days of the tax lien filing; and

4. State law gives the security interest holder priority over a judgment lien by an unsecured creditor, as of the time the Federal tax lien is filed.

Before measuring the facts of this case against these requisites, it appears appropriate at this juncture to further answer the government's initial allegation of insufficient specificity in view of the above criteria, and make several other pertinent observations.

■ First, it should be noted that the definition of "qualified property" specifically includes "inventory," and the committee reports indicate that said term encompasses everything from raw materials to finished products. Neither the Code nor the committee reports imply that these elements of inventory need to be specifically described or perpetually up-dated as to exact identity and amount of each, as the government suggests. In fact, exactly the opposite implication can be drawn from the face of the statute. Since subsection 6323(c) provides that collateral acquired by the taxpayer-debtor within 45 days *after* the tax lien filing will be subject to the lienor's priority if, among other conditions, the written agreement was entered into *prior* to the tax lien filing, it is evident that Congress envisioned the security agreements being allowed to describe collateral in broad enough terms that after-acquired property could automatically become subject to the creditor's lien without a constant rewriting of the agree-

ment as to exact quantities and specific identities of items currently covered by the agreement. In other words, if we required the government's suggested degree of specificity, it would be impossible to ever have property acquired during the 45-day grace period become subject to the creditor's prior lien since the security agreement is not allowed to be rewritten after the tax lien filing. Such a result is clearly not consistent with the intent of the statute, and this fact alone would contradict the government's assertion.

■■ We need not rely solely on the logical inferences of the statutory structure, however, since both the definition of a security interest, § 6323(h)(1)(A), and § 6323(c)(1)(B) explicitly provide that the standard of security perfection is dependent on "local law," i. e., if the security interest is sufficiently perfected under state law to be protected against an unsecured creditor's judgment lien, then it shall also be considered "perfected" for Federal tax lien priority purposes. Thus being directed to "local law," we find that the degree of specificity of description required by the Uniform Commercial Code (UCC) as adopted by Kansas, whose law is applicable herein, is set out in Kan.Stat.Ann. § 84–9–110 as follows:

> Except in the case of a description of real estate concerned with goods which are or are to become fixtures, for purposes of this article *any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described.* [Emphasis added].

The official comment for this provision explains that "under this rule courts should refuse to follow the holdings, often found in the older chattel mortgage cases, that descriptions are insufficient unless they are of the most exact and detailed nature, the so-called 'serial number' test." As a result, it is readily apparent that the UCC does not require, but instead rejects the degree of specificity which the government suggests is necessary. Based on this fact

and the logical inferences of the statutory structure, we must conclude that the collateral herein was described with sufficient specificity to make it reasonably identifiable at the appropriate point in time—45 days after the tax lien filing.

■■ Secondly, it is apparently necessary to clarify the scope of subsection 6323(c) since both parties virtually ignored it and the lower court found it inapplicable because "it speaks of a 'security interest which came into existence after tax lien filing,' and the security interest of plaintiff here came into existence before tax lien filing." While it is true that the plaintiff-appellant's security interest was "in existence" prior to the tax lien filing with respect to that collateral which the taxpayer had acquired prior to said filing, it is also true that a portion of the security interest did not "come into existence" until after the filing with respect to any after-acquired property. This result stems from the fact that the security interest ordinarily attaches automatically to new collateral the moment it is acquired, and hence cannot be "perfected" with respect thereto, until "the debtor has rights in the collateral." Uniform Commercial Code, Kan.Stat.Ann. §§ 84–9–204(1) and 84–9–303(1). This evolving security interest is, however, frozen after the 45th day with respect to loans already made and the value of property "acquired" by that time. Section 6323(c)(2)(A) and (B). Thus, we must also dismiss as wholly untenable appellant's contention that when a security interest comes into existence is solely dependent on when the loans are made and not when the property to which it attaches is acquired, since both the UCC and section 6323 make it clear that the security interest is perfected only as it attaches to the after-acquired property. Moreover, it is apparent that subsection 6323(c) defines the outer-limits of a creditor's protection, and it is obvious that a lien would not forfeit the benefits of its standards or avoid its requisites simply because there had been no changes in the status of the security interest dur–

ing the 45-day grace period. As a result, section 6323(c) is determinative of the lien priorities herein.

Returning now to an application of the above conditions of priority to the facts of this case, it is apparent that the first and second requisites are met, i. e., the 1966 First National and 1968 Alliance Capital security agreements were entered into prior to the December 12, 1969 tax lien filing and qualify under section 6323(c)(2)(A)(i), and the relevant loans were made pursuant to these agreements within 45 days of the tax lien filing. Appellant also endeavors to base his priority on security agreements which First National entered into with the taxpayer in July, August and September of 1970 and were subsequently assigned to appellant in September 1971. Since these security agreements were entered into *after* the tax lien filing by some eight months or more (one day after would be just as fatal), appellant clearly can draw no support from these documents with respect to the December 1969 tax lien. Section 6323(c)(1). However, they would be relevant to any tax liens filed after their execution.

Similarly, there does not appear to be any problem with meeting the fourth requirement that the security interest have priority under local law over a judgment lien arising out of an unsecured obligation, as of the time of tax lien filing. The required steps for perfection under U.C.C., Kan.Stat.Ann. §§ 84–9–302 to 84–9–306 appear to have been met herein, and the government has not suggested otherwise. Although this "state priority" issue is measured as of the time of tax lien filing, it is pertinent to note that because a judgment lienor, like a secured creditor, could not attach his lien to after-acquired property until said property is, in fact, "acquired," the judgment lien could not possibly be perfected *prior* to the security holder's interest being perfected. Thus, if a security holder has priority at the time of the tax lien filing, he will retain that priority during the 45-day grace period as to after-acquired property.

The third requisite, however, presents questions of less certainty. Five of the trailers in issue were not completed until some eight months after the Federal tax lien was filed. The sixth was a trade-in. The government contends that the phrase "came into being or existence" should be used interchangeably with the word "acquired" in subsection 6323(c)(2)(B)'s limitation on "qualified property," i. e., only collateral which "came into existence" before the 46th day after the tax lien filing would be subject to the security holder's priority. As a result, the government maintains that the trailers in issue are not "qualified property" since they did not "come into existence" within 45 days of the tax lien filing.

The effect of the government's construction, as we understand it, would be a finding that any items which constituted "goods-in-process" on the 45th day (subject to the security holder's lien priority) would no longer be counted as "qualified property" (priority collateral) if on the 46th day the taxpayer added a coat of paint or some other finishing touches which would now place the items in the category of "finished products." That is to say, since the items were not "in existence" as "finished products" on the 45th day after tax lien filing, none of their value would be subject to the lien holder's priority when they are subsequently completed, although said finished products admittedly: (1) would have been subject to his priority if they had been "in existence" on the 45th day, rather than the 46th, and (2) contain substantial materials which were owned by the taxpayer on the 45th day. We cannot concur with such an interpretation of the statute.

While we find it evident from the face of the statute that property not yet owned or "acquired" by the debtor-taxpayer by the 45th day after the tax lien filing, such as purchases of new raw materials or new equipment, would not

be subject to the creditor's priority, we find it equally clear that where property owned by the debtor within the 45-day period subsequently undergoes transformations in character and form, such as the evolution of raw materials into final products and eventually cash proceeds, as occurred herein, the creditor does not lose his security interest in the value of that property which was owned on the 45th day. Implicit in this conclusion, however, is the fact that the creditor would have no rights to the "value-added" to the product after the 45th day by the addition of either labor or *parts subsequently acquired.*

It is with some surprise—although the inappropriateness and invalidity of the bulk of the *government's* contentions should have put us on notice—that we find our foregoing conclusions strongly supported by the government's own Proposed Treasury Regulation § 301.-6323(c)–1(d), which provides, in relevant part, that:

> * * * qualified property consists solely of commercial financing security acquired by the taxpayer-debtor before the 46th day after the date of tax lien filing * * *. Inventory is acquired by the taxpayer when title passes to him. *Identifiable proceeds, which arise from the collection or disposition of qualified property by the taxpayer, are considered to be acquired at the time such qualified property is acquired if the secured party has a continuously perfected security interest in the proceeds under local law.* The term "proceeds" includes whatever is received when collateral is sold, exchanged, or collected. For purposes of this paragraph, the term "identifiable proceeds" does not include money, checks and the like which have been commingled with other cash proceeds. *Property acquired by the taxpayer after the 45th day following tax lien filing, by the expenditure of proceeds, is not qualified property.* [emphasis added].

 It is evident from the preceding proposed regulation that not only

cash proceeds from the disposition of the pre-46th day collateral are qualified property, but also that which may be received in exchange for said property. Consequently, the trade-in trailer involved herein would constitute qualified property to the extent that its value reflects an exchange for property owned by the taxpayer before the 46th day after the tax lien filing. However, it should be noted that the proposed regulation suggests that once protected collateral is reduced to cash proceeds, it may not be reinvested in similar products and still be considered qualified property. We concur in this conclusion, for while we accept the commercial necessity of allowing continued production of that which is in process, we also recognize the necessity of ending the perpetuity of the taxpayer's liens by payment of his debts and tax obligations with the consequent funds.

 Thus, the crucial fact which should have been determined in this case was an analysis of what portion of the finished products' value was attributable to the inclusion of property which was owned by the taxpayer before the 46th day after the tax lien filing. The government maintains, in anticipation of this conclusion, that the judgment of the lower court must be affirmed since the appellant failed to allege or prove this value and thereby failed to sustain his burden of proof on one of the elements that is indispensable to showing the superiority of his claims under section 6323. We are forced to agree, and it is on this ground alone that we normally would affirm the decision of the lower court.

However, as pointed out, much of the briefing to us was inappropriate. Our record also shows that the critical issue which has been defined, was not properly presented to the trial court. Moreover, the stipulation of facts on which the case was submitted does not cover the issue as to what portion of the finished products' (the trailers) value was attributable to inclusion of property owned by the taxpayer within 45 days

after the tax lien was filed. And the recent proposed regulation, favoring the appellant which is discussed above, was not before the trial court.

Accordingly, in the interest of justice we remand this case with directions to the District Court for further proceedings in accordance with this opinion. Hormel v. Helvering, 312 U.S. 552, 558–559, 61 S.Ct. 719, 85 L.Ed. 1037; Youngstown Sheet and Tube Co. v. Lucey Products Co., 403 F.2d 135, 140 (5th Cir. 1968); Empire Life Insurance Co. of America v. Valdak Corp., 468 F.2d 330, 334 (5th Cir. 1972).