**In re NATIONAL FINANCIAL ALTERNATIVES, INC., Debtor.**

**Bankruptcy No. 88 B 9577.**

United States Bankruptcy Court, N.D. Illinois, E.D.

Feb. 22, 1989.

Deborah Ebner, Evanston, Ill.

Dean Harvalis, Chicago, Ill., Asst. U.S. Trustee.

Daniel A. Zazove, Towbin & Zazove, Ltd., Chicago, Ill., for Creditor's Committee.

Joseph Cammarata, Dept. of Justice, Tax Div., Civil Trial Section, Northern Region, Washington, D.C., Victoria Crosley, I.R.S., Joel Nathan, Illinois Dept. of Revenue, State of Illinois Center, Chicago, Ill., for I.R.S.

Lynn E. Botka, Lockport, Ill.

Rene J. Mathieu, Oak Brook, Ill.

Keevan D. Morgan, Drugas, Morgan & Hyink, Chicago, Ill., for debtor.

William J. Connelly, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill.

Pamela S. Hollis, Hollis & Johnson, Chicago, Ill., for First Midwest Bank/Joliet.

## MEMORANDUM OF DECISION

EUGENE R. WEDOFF, Bankruptcy Judge.

The matters presently before the court raise, in the context of a Chapter 11 reorganization, a narrow, but unsettled issue regarding the reach of federal tax liens: whether accounts receivable acquired by a debtor more than 45 days after the filing of a notice of tax lien on the debtor's property may be considered proceeds of contract rights or inventory acquired by the debtor prior to the expiration of that 45–day period, so that the security interest of a commercial creditor in the receivables has priority over the tax lien, pursuant to 26 U.S.C. § 6323(c) and 26 CFR § 301.6323(c)–1. For the reasons set forth below, the court finds that, in the circumstances of this case, accounts receivable may be proceeds of both inventory and contract rights.

### Findings of Fact

Most of the relevant facts are not in dispute. The debtor, National Financial Alternatives, Inc. ("NFA"), is in the business of fabricating certain specialized steel products, such as pressure vessels used in the petroleum and chemical industries and heads for such vessels. In the course of its business, NFA receives purchase orders; buys raw material (primarily steel or alloy plate); fabricates the raw material pursuant to the purchase orders; ships the finished product, generating accounts receivable; and then collects the receivables.

NFA's principal creditor is First Midwest Bank/Joliet ("the Bank"). NFA presently is indebted to the Bank in an amount somewhat less than $2,000,000, under various notes. All of this indebtedness is covered by real estate mortgages and security agreements encumbering NFA's "hard assets"—furniture, equipment, and machinery—and there is no dispute regarding the priority of the Bank's security interest in this relatively permanent property. However, about $550,000 of the total indebtedness (guaranteed by the Small Business Administration), is covered by a security agreement, executed in March, 1986, which provides for an additional security interest

on behalf of the Bank in NFA's "soft collateral"—inventory, raw material, work in progress, supplies, accounts receivable, contract rights, general intangibles, and their proceeds—whether in existence at the time of the security agreement or acquired thereafter. A UCC–1 Financing Statement, describing this collateral, was filed on March 31, 1986.

This was the state of NFA's financing when, on April 6, 1988, the Internal Revenue Service ("IRS") filed a notice of federal tax lien against NFA, in the amount of $122,417.56, for withholding taxes assessed in 1987. Seventy-seven days later, on June 22, 1988, NFA filed its Chapter 11 petition. At the time of this petition, according to its bankruptcy schedules, NFA's total assets amounted to about $1.6 million, leaving the Bank substantially undersecured.[1] NFA's schedules also reflect that, at the time of filing, NFA had virtually no cash, but did have more than $250,000 in accounts receivable and $180,000 in inventory.

Both the Bank and the IRS sought to protect their interests in the NFA's assets by filing motions to prohibit NFA from using cash collateral, pursuant to § 363(e) of the Bankruptcy Code, Title 11, U.S.C. ("the Bankruptcy Code"). Although both the Bank and the IRS mentioned inventory in their § 363(e) motions, all of the subsequent briefing has dealt with disputed claims to accounts receivable. The Bank claims a prime interest in all of the accounts receivable; the IRS claims such an interest, on behalf of the United States, in those receivables that were acquired by NFA more than 45 days after the notice of tax lien was filed. Pursuant to various agreements between the parties, NFA has continued to operate, collecting its accounts receivable and using the collections in the ordinary course of its business, pending a determination by the court as to the § 363(e) motions.

On December 21, 1988, after extensive briefing and argument, the court announced a determination orally. This memorandum sets forth the court's reasoning and corrects an error in the original determination.

### Conclusions of Law

**Jurisdiction.** The motions now before the court raise issues that are within the court's core jurisdiction pursuant to 28 U.S. C. § 157(b)(2)(K) and (M).

**Background.** The legal framework in which the pending motions arise can be set out in three steps.

*First,* under the Uniform Commercial Code, enacted in Illinois as Ill.Rev.Stat. ch. 26, ¶ 1–101 *et seq.* (the "U.C.C."), the Bank in this case, pursuant to the March 1986 security agreement and financing statement, had a perfected security interest both in the inventory, accounts receivable, and purchase orders of NFA, and also in the proceeds of these items of collateral.[2] A number of related provisions of the U.C. C. combine to produce this result. *See* B. Clark, *The Law of Secured Transactions Under the Uniform Commercial Code* ¶¶ 10.1 and 11.1 (1980) ("Clark").

• U.C.C. § 9–102(a) brings the "soft collateral" at issue here within the ambit of Article 9 of the Code, by providing that Article 9 applies to "any transaction ... which is intended to create a security interest in personal property or fixtures, including goods, documents, instruments, general intangibles, chattel paper or accounts."[3]

---

1. The scheduled value of NFA's assets has been questioned by the unsecured creditors' committee, on the basis of an insurance appraisal showing a much higher valuation. The court makes no finding here as to this issue. However, the legal questions raised by the Bank and the IRS assume that the Bank is in fact undersecured, so that the IRS must obtain priority over the Bank's interests in NFA's assets in order to have any secured claim of its own.

2. All of NFA's inventory and accounts receivable are located in Illinois, since its offices and fabrication facilities are exclusively in this state. Hence the Illinois enactment of the Uniform Commercial Code is applicable here. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Ill.Rev.Stat. ch. 26, ¶ 9–103(b) (1987).

3. "Goods" is defined by U.C.C. § 9–105(1)(h) to include "all things which are movable at the time the security interest attaches," and so cov-

• U.C.C. § 9–204 deals with the problem of turnover of accounts and inventory by allowing a security agreement to provide that an obligation may be secured by property that the debtor acquires after execution of the agreement, and U.C.C. §§ 9–110 and 9–402 provide that the security interest in such after-acquired property is continuously perfected by the filing of the usual financing statement. (The Bank's March 1986 security agreement does provide for a security interest in after-acquired property.)

• U.C.C. § 9–306(2) extends security interests in all types of property to the *proceeds* of that property, by providing that a security interest "continues in any identifiable proceeds including collections received by the debtor." "Proceeds" is defined in U.C.C. § 9–306(1) as including "whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds," and U.C.C. § 9–306(3) provides, with exceptions not relevant here, that the security interest in proceeds is also continuously perfected by the filing of a financing statement covering the original collateral. Thus, even without the language in the Bank's security agreement covering the "proceeds" of the specified property, and the reflection of this language in the filed financing statement, the Bank would have a security interest in the proceeds of its collateral.

As a result of the perfected security interest that the Bank thus had in NFA's contract rights, inventory, and accounts receivable, its claim on these assets would have priority over those of unsecured judg-

ment creditors and most later-perfected secured creditors. U.C.C. §§ 9–201 and 9–301(1)(b); Clark, ¶ 10.1[5]. The position of the Bank as a secured creditor under the U.C.C., is not in dispute.

*Second,* under the Internal Revenue Code (Title 26, U.S.C.), the United States has a competing interest in all of NFA's property—including its inventory, receivables, and purchase orders—subject to limitations whose application is in dispute here. Section 6321 of the Internal Revenue Code provides that, at the time federal taxes are assessed against a taxpayer, the United States acquires a lien "upon all property and rights to property" belonging to the taxpayer, in the amount of the assessed taxes and penalties. Case law has established that this lien also attaches to property that the taxpayer acquires after the imposition of the lien. *See, e.g., Glass City Bank v. United States,* 326 U.S. 265, 267, 66 S.Ct. 108, 110, 90 L.Ed. 56 (1945); *Rice Investment Co. v. United States,* 625 F.2d 565, 568 (5th Cir.1980).

However, § 6323 of the Internal Revenue Code limits the impact of the § 6321 tax lien on holders of perfected security interests in the taxpayer's property. Section 6323(f) creates a procedure for the filing of a notice of tax lien, and §§ 6323(a) and (h) provide that a tax lien is generally subordinate to security interests that (1) were perfected before the notice of tax lien was filed, and (2) are in property that the taxpayer acquired *before* the notice of lien was filed—to the extent that the holder of the security interest "has parted with money or money's worth." *See* Clark, ¶ 5.2.[4]

---

ers inventory. "Accounts," in turn, is defined by § 9–106 as "any right to payment for goods sold … which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance," and so includes both accounts receivable and unfilled purchase orders.

**4.** Section 6323(a) states that a § 6321 tax lien "shall not be valid as against any … holder of a security interest … until notice thereof which meets the requirements of subsection (f) has been filed." Section 6323(h) defines "security interest" to mean "any interest in property acquired by contract for the purpose of securing payment or performance of an obligation or

indemnifying against loss or liability." However, the definition goes on to provide that a security interest only "exists" (A) at such time as "the property is in existence and the interest has become protected under local law against a subsequent judgment lien arising out of an unsecured obligation" and (B) "to the extent that, at such time, the holder has parted with money or money's worth." Thus, under these provisions, the tax lien is recognized as attaching to the taxpayer's property as of assessment, pursuant to § 6321, but is rendered ineffective ("invalid") as against holders of security interests that meet the requirements of § 6323(h), including the requirement that the property in which the se-

Moreover, and of particular relevance here, § 6323(c) of the Internal Revenue Code subordinates the tax lien to security interests in property that the taxpayer acquired *after* the filing of notice of tax lien under specified circumstances. As described in more detail below, § 6323(c), interpreted by Treasury Regulation 301.-6323(c)–1, preserves the priority of certain perfected security interests in property acquired by a taxpayer during a 45–day period after filing of the tax lien, and in the proceeds of that property.

The dispute between the Bank and the IRS is over the application of § 6323(c) to the accounts receivable acquired by NFA more than 45 days after filing of the tax lien (the "disputed receivables"). Both claim a prime security interest in as many of the disputed receivables as were in existence at the time that NFA filed its Chapter 11 petition.

■ *Third,* under the Bankruptcy Code, the resolution of the dispute between the Bank and the IRS is necessary to decide the pending motions under § 363(e)—for several reasons. At the outset, the question of whether the United States has an interest in the disputed receivables will determine the extent to which both it and the Bank have any secured claim against NFA recognizable in bankruptcy. Under § 506(a) of the Bankruptcy Code, the secured claims of a creditor are limited to the value of its interests in the debtor's property, and claims in excess of this value are

deemed unsecured.[5] Furthermore, to the extent that claims are unsecured under § 506(a), the liens securing those claims are void under § 506(d).[6] *In re Dente/Pender,* 60 B.R. 164, 165–66 (Bankr.M.D.Fla.1986); *In re Frost,* 19 B.R. 804, 808 (Bankr.D. Kan.1982), *rev'd in part on other grounds,* 47 B.R. 961 (D.Kan.1985); *In re Blakey,* 78 B.R. 435, 437 (Bankr.E.D.Pa.1987) (citing additional authority). The relevant time for assessing the value of secured claims is the time of filing the bankruptcy case. *In re Dente/Pender,* 60 B.R. at 165. Thus, if, as the Bank argues, the tax lien in this case gave the United States no interest in NFA's property at the commencement of this case, then (1) the United States has only an unsecured claim against NFA under § 506(a) and (2) the tax lien against NFA is void under § 506(d). Such a finding would require that the IRS's motion under § 363(e) be denied. Similarly, the Bank's secured claim would be reduced and its lien voided to the extent that the tax lien does prime the Bank's security interest in any of NFA's property.

The extent of the interests of the Bank and the IRS in the disputed receivables will also determine the extent to which NFA must provide adequate protection to either creditor before collecting these receivables. The pending § 363(e) motions were nominally filed by the Bank and the IRS "to prohibit use of cash collateral," and accounts receivable are not "cash collateral" under the Bankruptcy Code.[7] However,

---

curity interest is claimed be "in existence" at the time that notice of the lien is filed.

5. Section 506(a) provides, in pertinent part:
   An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim. Such value shall be determined in light of ... the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use....

6. Section 506(d) of the Bankruptcy Code provides, with exception not applicable here, that "to the extent that a lien secures a claim against

the debtor that is not an allowed secured claim, such lien is void."

7. Section 363(a) limits "cash collateral" to "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents." The legislative history reflects that other types of transitory property were deliberately omitted from the definition. As originally proposed by the House, § 363 dealt with "soft collateral" rather than "cash collateral," and § 363(a) defined "soft collateral" as "inventory, accounts, contract rights, general intangibles, cash, negotiable instruments, documents of title, securities, or chattel paper in which the estate and an entity other than the estate have an interest." House Report No. 95–595; 95th Cong., 1st Sess. 344–45, *reprinted in* 1978 U.S. Code Cong. & Ad.News 5787, 5963, 6301. The Senate proposed the present language of § 363,

the protection offered to creditors under § 363(e) is not limited to cash collateral, but requires the court, upon motion, to prohibit the use of *any* property of the debtor in which another party has an interest not adequately protected.[8] Upon their motions, the Bank and the IRS are therefore entitled to adequate protection of whatever interests they have in the disputed accounts receivable.

Finally, the issues raised by the Bank and the IRS do, in the end, affect NFA's use of cash collateral. Section 552(a) of the Bankruptcy Code generally provides that "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." However, under § 552(b), the Bank's interest in NFA's accounts receivable would extend to the "proceeds" of their collection post-petition.[9] Such proceeds would be "cash collateral" under § 363(a) of the Code, which, pursuant to §§ 363(c)(2), (c)(4) and (o), NFA would be required to segregate, and refrain from using, until it obtains either the consent of each entity that has an interest in the proceeds or a court order allowing the use,

conditioned on provision of adequate protection.

The United States also has a potential interest in cash acquired by NFA post-petition. Section 552(a) of the Bankruptcy Code does not prevent property acquired by NFA after the commencement of this case from being subject to the IRS's tax lien, since it applies only to liens arising from "security agreement[s] entered into by the debtor." A tax lien does not result from any such security agreement, but rather from the operation of the Internal Revenue Code. Thus, to the extent that the tax lien in this case is not voided pursuant to § 506(d) of the Bankruptcy Code, it would continue to attach to property obtained by NFA after the commencement of this case, subject to any interest of the Bank in post-petition proceeds allowed under § 6323(c) of the Internal Revenue Code. *United States v. Booth Tow Services, Inc.,* 64 B.R. 539, 541–42 (W.D.Mo.1985); *In re Frost,* 19 B.R. 804, 808 (Bankr.D.Kan. 1982), *reversed in part on other grounds,* 47 B.R. 961 (D.Kan.1985); *see In re Robinson,* 39 B.R. 47, 49 (Bankr.E.D.Va.1984) (tax lien attaches to retirement payments acquired by Chapter 13 debtor post-petition).[10] The cash and cash equivalents ob-

and the House concurred "to remove limitations that were placed on the use, lease, or sale of inventory, accounts, contract rights, general intangibles, and chattel paper by the trustee or debtor in possession." H.R. 8200, 95th Cong. 2d Sess., 124 Cong.Rec. 32,396 (1978).

**8.** Section 363(e) provides, in pertinent part:
Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used ... or proposed to be used ... by the trustee, the court, with or without a hearing, shall prohibit or condition such use ... as is necessary to provide adequate protection of such interest.

**9.** Section 552(b) provides, in relevant part:
[I]f the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds ... of such property, then such security interest extends to such proceeds ... acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law.

Although "proceeds" is not defined by the Bankruptcy Code, its ordinary meaning—and the definition employed in the U.C.C., noted at p. 4 above—would require that any funds received by NFA in payment of its accounts receivable be considered "proceeds."

**10.** *In re Dente/Pender,* 60 B.R. 164, 165 (Bankr. M.D.Fla.1986) states that "there is respectable authority to support the proposition that a Debtor–In–Possession is a separate entity from the taxpayer and, thus, properties acquired by the Debtor–In–Possession post-petition cannot secure a pre-petition tax obligation." There appears to be no authority so holding, however, and there are at least two reasons why this should not be the rule. First, such a rule would result in statutory superfluity. If pre-petition liens generally did not attach to property acquired by a debtor post-petition, because the debtor in possession (or the estate) is a separate entity, then § 552(a) would be entirely unnecessary. Second, such a rule would place an impossible burden on the IRS in attempting to enforce tax liens against accounts receivable or other impermanent assets. Section 552(b) of the Bankruptcy Code gives no protection to the post-petition proceeds of property encumbered

tained by NFA post-petition would therefore be "cash collateral" as to which the IRS may also demand the protections of §§ 363(c)(2), (c)(4) and (o), to the extent of its interest.

**The operation of subsection 6323(c).** Section 6323 of the Internal Revenue Code was added to the Code by the Federal Tax Lien Act of 1966. That Act was "the first comprehensive revision and modernization of the provisions of the internal revenue laws concerned with the relationship of Federal tax liens to the interests of other creditors" and it was, in part, "an attempt to conform the lien provisions of the internal revenue laws to the concepts developed in [the] Uniform Commercial Code." S.Rep. No. 1708, 89th Cong., 2d Sess., *reprinted in* 1966 U.S.Code Cong. & Ad. News 3722. Subsection 6323(c) deals specifically with the accounts receivable and inventory financing arrangements recognized by the U.C.C., according certain protection to a lender secured by collateral with a potentially rapid turnover.

The operation of the subsection, for the purposes of this opinion, can be traced out as follows:

(a) Accounts receivable and inventory are types of collateral included within the term "commercial financing security," pursuant to § 6323(c)(2)(C).[11]

(b) Commercial accounts receivable and inventory financing arrangements are included within the term "commercial transactions financing agreement," pursuant to § 6323(c)(2)(A).[12]

(c) Pursuant to § 6323(c)(1), a security interest in "qualified property" covered by the terms of a commercial transactions financing agreement is unaffected by a tax lien against the property, even though notice of the tax lien was filed before the security interest came into existence, provided that the security interest would be similarly protected under local law.[13] (The applicable local law in this case is the Illinois Uniform Commercial Code, which does, as noted at p. 4 above, protect such security interests in after-acquired property.)

(d) The "qualified property," security interests in which are protected against previously filed tax liens, includes "commercial financing security" such as accounts receivable and inventory, but is limited to property acquired by the taxpayer within a 45–day period after the filing of the tax lien, pursuant to § 6323(c)(2)(B).[14]

by a tax lien pre-petition, since, like § 552(a), it applies only to consensual security agreements. Accounts receivable and inventory are not themselves cash collateral that a debtor is prohibited from using pursuant to § 363, as noted at p. 7, above. Therefore, if tax liens did not attach to property acquired by a debtor in possession post-petition, the debtor in possession would nullify the lien on its receivables by collecting them, and nullify the lien on its inventory by selling it, in the ordinary course of business (pursuant to § 363(c)), before the IRS could file a motion to prohibit this use, pursuant to § 363(e). It is more consistent with the language and rationale of the Bankruptcy Code to hold that tax liens do attach to property acquired post-petition.

**11.** Section 6323(c)(2)(C) defines "commercial financing security" as "(i) paper of a kind ordinarily arising in commercial transactions, (ii) accounts receivable, (iii) mortgages on real property, and (iv) inventory."

**12.** In relevant part, § 6323(c)(2)(A) provides: "For purposes of this subsection—The term 'commercial transactions financing agreement'

means an agreement (entered into by a person in the course of his trade or business)—(i) to make loans to the taxpayer to be secured by commercial financing security acquired by the taxpayer in the ordinary course of his trade or business...."

**13.** Section 6323(c)(1) provides in pertinent part: "To the extent provided in this subsection, even though notice of a lien imposed by section 6321 has been filed, such lien shall not be valid with respect to a security interest which came into existence after tax lien filing but which—(A) is in qualified property covered by the terms of a written agreement entered into before tax lien filing and constituting—(i) a commercial transactions financing agreement, ... and (B) is protected under local law against a judgment lien arising, as of the time of tax lien filing, out of an unsecured obligation."

**14.** Section 6323(c)(2)(B) provides: "The term 'qualified property', when used with respect to a commercial transactions financing agreement, includes only commercial financing security acquired by the taxpayer before the 46th day after the date of tax lien filing."

Section 6323(c) is itself silent as to whether security interests in the *proceeds* of "qualified property" are protected against previously filed tax liens. Thus, after adoption of this section, commentators looked for guidance on this issue from the Treasury. *See, e.g.,* W. Plumb, *Federal Tax Liens* 108–09 (3d ed.1972). In 1976, the Treasury issued a regulation, published as 26 CFR § 301.6323(c)–1, addressing this and other issues. The regulation includes the following in its description of "qualified property":

> Identifiable proceeds, which arise from the collection or disposition of qualified property by the taxpayer, are considered to be acquired at the time such qualified property is acquired if the secured party has a continuously perfected security interest in the proceeds under local law. The term "proceeds" includes whatever is received when collateral is sold, exchanged, or collected. For purposes of this paragraph, the term "identifiable proceeds" does not include money, checks and the like which have been commingled with other cash proceeds. Property acquired by the taxpayer after the 45th day following tax lien filing, by the expenditure of proceeds, is not qualified property.

26 CFR § 301.6323(c)–1(d). Thus, the proceeds of "qualified property," are themselves qualified property, as long as these proceeds are not commingled or expended to acquire other property outside the 45-day period. *See* Clark ¶ 5.7[3] at 5–20; W. Plumb, *Federal Tax Liens* 19 (3d ed. Supp. 1981).

Similarly, the text of § 6323(c) does not expressly indicate whether contract rights (such as purchase orders), as to which the right to payment is not yet earned, may constitute qualified property. Again, however, the regulation fills the void. The statute itself (§ 6323(c)(2)(C)) lists "paper

of a kind ordinarily arising in commercial transactions" as one type of "commercial financing security" that can constitute "qualified property." The regulation, in turn, defines "paper of a kind ordinarily arising in commercial transactions," to include "any written document customarily used in commercial transactions," including "paper giving contract rights." 26 CFR § 301.6323(c)–1(c)(1). Moreover, the regulation defines "contract right" specifically as "any right to payment under a contract not yet earned by performance and not evidenced by an instrument or chattel paper," 26 CFR § 301.6323(c)–1(c)(2)(i), thus tracking the U.C.C. definition of "account". Finally, the regulation makes it clear that a contract right is deemed "acquired by the taxpayer when the contract is made" rather than at the time the right to payment is earned by performance. 26 CFR § 301.6323(c)–1(d).

■ **Application of § 6323(c).** For the most part, the framework created by § 6323(c) and the regulation apply to the present case in a fairly straightforward fashion. There is no dispute that the March 1986 financing agreement between the Bank and NFA is a commercial transactions financing agreement, and that NFA's contract rights, accounts receivable and inventory, covered by that agreement, are commercial financing security. The IRS filed its notice of tax lien against NFA on April 6, 1988, and the 45-day period for "qualified property" therefore terminated on May 21, 1988.[15]

The dispute in this case is whether accounts receivable acquired by NFA after May 21, 1988, but before its bankruptcy filing on June 22, should be considered "qualified property" on the theory that these receivables are proceeds of property acquired by NFA prior to May 21. The Bank argues that the disputed accounts

---

**15.** NFA and the Bank assert that the 45-day period terminated on May 23, apparently because May 21 was a Saturday. However, there is nothing in Section 6323 providing that the 45-day period should be extended if it falls on a Saturday or Sunday. Section 7503 of the Internal Revenue Code provides such an extension for periods of time specified by the Code "for performing any act." However, the period of protection from the tax lien specified by Section 6323 is not a period for the performing of an act. Moreover, there is no reason why commercial financing security cannot be acquired on Saturday and Sunday, so that there would be no reason for such an extension.

receivable—generated by NFA during the period from May 21 to June 22—were all or nearly all the proceeds of purchase orders (*i.e.*, contract rights) that NFA acquired prior to May 21. NFA argues that the disputed accounts receivable should be considered proceeds of inventory rather than contract rights, and hence that the Bank has an interest in the disputed accounts receivable to the extent that they reflect the value of inventory in existence prior to May 21, and that the United States has an interest in these receivables to the extent that they reflect value added to inventory after May 21. The IRS argues, simply, that accounts receivable cannot be considered "proceeds."

**Proceeds of contract rights.** The IRS supports its position with two arguments, one based on the language of the regulation, the other based on the legislative history of § 6323(c). The regulation, the IRS points out, contains a separate definition of "account receivable"—as "any right to payment for goods sold ... which is not evidenced by an instrument or chattel paper," 26 CFR § 301.6323(c)–1(c)(2)(ii)—and provides that "[a]n account receivable ... is acquired by a taxpayer at the time, and to the extent, a right to payment is earned by performance," 26 CFR § 301.6323(c)–1(d). Thus, the argument continues, whatever the rule may be regarding the time of acquisition of proceeds, these rules do not apply to accounts receivable, because accounts receivable may *only* be acquired at the time the right to payment is earned, pursuant to 26 CFR § 301.6323(c)–1(d)—in

other words, accounts receivable may not be considered proceeds of any form of collateral.

This argument cannot be accepted. The Treasury Regulation plainly extends the protection for security interests in "qualified property" to the proceeds of that property, and "proceeds" will normally take only a few forms: cash, negotiable instruments, or accounts receivable. There is nothing in the regulation that distinguishes between the various forms of proceeds: all fit within the regulation's definition of proceeds ("whatever is received when collateral is sold, exchanged, or collected"), and all should accordingly be deemed acquired when the original qualified property is acquired. Indeed, if this first argument of the IRS were accepted, there would arise an irrational system in which a check received in exchange for inventory at the time of delivery would be considered "proceeds" of that inventory (no account receivable being generated), but an account receivable acquired on sale of the same inventory would not be considered proceeds of inventory, even though paid in cash the day after delivery.[16]

The IRS's second argument is that, in enacting § 6323(c), Congress intended to provide only a 45–day period of protection for holders of security interests in after-acquired property, and that if accounts receivable are considered proceeds of contract rights, then Congress's intent can be defeated by any lender who takes a security interest in the right to payment under a long term contract.[17] This argument, how-

---

**16.** Contrary to the IRS's argument, this reading does not render meaningless the provision of the regulation stating that accounts receivable are acquired when earned. That provision is fully applicable when the accounts receivable are not proceeds of qualified property—for example, when the security interest in question extends only to accounts receivable themselves, or where the account receivable was not generated through previous contracts or inventory (as with receivables arising from services rendered without prior written orders). *See State Bank of Fraser v. United States,* 861 F.2d 954, 965 n. 13 (6th Cir.1988) ("[N]ot all accounts receivable are proceeds of a contract.")

**17.** In making this argument, the IRS relies on a discussion of § 6323(c) in the Senate Report

accompanying the legislation that became the Tax Lien Act of 1966:

> [The bill] provides that security interests arising under commercial transactions financing agreements ... are to be protected against Federal tax liens, even though ... the property referred to in the agreement comes into existence after the tax lien filing.
>
> \* \* \* \* \* \*
>
> [P]rotection is afforded ... only where the inventory, accounts receivable, etc., are acquired before the 45 days [after the tax lien filing] have elapsed.
>
> \* \* \* \* \* \*
>
> This provisions thus generally gives an inventory or accounts receivable, etc., financier assurance that his loans ... are not inferior to

ever, is really addressed, not to the question of whether accounts receivable should be considered proceeds of contract rights, but whether contract rights should be protected as "qualified property" under § 6323(c). Payment under a long term contract would frustrate what the IRS perceives as Congressional intent just as much if it were made on a COD basis as it would if made through accounts receivable.

In fact, neither the statutory language nor the Senate Report address the issue of financing secured by contract rights. However, the House Report does state that executory contract rights are included in the "commercial financing security" that may be "qualified property." H.R.Rep. No. 1884, 89th Cong. 2d Sess. 42 (1966). And more significantly, the regulation unambiguously extends the protections accorded "qualified property" to contract rights, as noted above. The regulation is binding on the IRS. *Lansons, Inc. v. C.I.R.*, 622 F.2d 774, 776 (5th Cir.1980) ("Treasury regulations are as binding upon tax officials as they are upon taxpayers, and tax officials are required to abide by regulations reasonably based on the statute."). Under § 6323(c), as effectuated by the regulation, a contract right is acquired when the contract is entered into, even though performance may not occur for years, and the proceeds of that contract right, regardless of the form they take, are also deemed acquired when the contract was entered into.[18]

**Proceeds of inventory.** NFA's position in this dispute is that the IRS and the Bank should share a security interest in the disputed accounts receivable, based on their interests in the inventory that generated the receivables. *See Donald v. Madison Industries, Inc.*, 483 F.2d 837, 845 (10th Cir.1973) ("The critical fact ... [is] what

portion of the finished products' value was attributable to the inclusion of property which was owned by the taxpayer before the 46th day after the tax lien filing."). This was the position adopted by the court in its oral ruling, but it is incorrect. NFA's analysis is appropriate insofar as it notes that accounts receivable are the proceeds of inventory, but the analysis fails insofar as it ignores the fact that accounts receivable may also be the proceeds of contract rights. It is certainly possible for a single category of assets to be encumbered by security interests arising out of different descriptions of property. *See* W. Davenport & D. Murray, *Secured Transactions* 305–16 (1978). Section 6323(c) renders a Federal tax lien invalid with respect to *any* qualifying security interest. Thus, if the Bank has such a qualifying security interest in the disputed accounts receivable, by virtue of their being proceeds of contract rights, the tax lien is invalid to that extent. The fact that the Bank may have a less extensive protected interest in the receivables by virtue of their being proceeds of inventory is irrelevant.

**The extent of the United States' secured claim.** The holdings set forth above, contrary to the Bank's arguments, do not eliminate the secured claim of the United States. It is likely that the vast majority of the accounts receivable held by NFA at the time it filed its bankruptcy petition were (1) acquired before May 21, (2) the proceeds of contract rights acquired before May 21, or (3) the proceeds of inventory acquired before May 21. The Bank's security interest in all such accounts receivable would be protected by Section 6323(c). Nevertheless, it is the Bank's burden to prove which of the accounts receivable fit into these categories.[19]

---

some recently filed tax lien as long as he searches the records at least once every 45 days.

S.Rep. No. 1708, 89th Cong, 2d Sess. 7–8, *reprinted in* 1966 U.S.Code Cong. & Ad.News 3722, 3728–29.

**18.** This holding is supported by *State Bank of Fraser v. United States*, 861 F.2d 954 (6th Cir. 1988) (which counsel for the IRS graciously brought to this court's attention while the deci-

sion was available only in slip opinion), and the Clark treatise, at ¶¶ 5.7[4] and 11.9.

**19.** Section 363(*o*)(1) of the Bankruptcy Code provides that in any hearing under § 363, "the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest." The IRS has established the interest of the United States in all of the property of NFA, in the amount of the tax lien, pursuant to § 6321 of the Internal

Furthermore, the accounts receivable, despite the parties' concentration on them, are not the only property of NFA as to which the Bank's security interest may be subordinate to the tax lien claim of the United States. NFA had virtually no cash at the time it filed its bankruptcy petition, but it did have over $180,000 in inventory, at least some of which may have been purchased with cash received by NFA between May 21 and June 22. Any inventory (or other asset) so purchased—even though purchased with proceeds of "qualified property" under 6323(c)—is deemed not to be qualified property, pursuant to 26 CFR § 301.6323(c)–1(d) ("Property acquired by the taxpayer after the 45th day following tax lien filing, by the expenditure of proceeds, is not qualified property.") Again, it is the Bank's burden to show what portion of the inventory was acquired before May 21.

Finally, the IRS is entitled to claim an interest, prior to that of the Bank, in the contract rights that NFA obtained between May 21 and June 22. These rights must be valued, and the burden of establishing that value is on the IRS, pursuant to § 363(*o*)(1) of the Bankruptcy Code, but these contract rights may also add to the value of the United States' secured claim.

## Conclusion

The Bank has a secured claim in the receivables of NFA, entitled to adequate protection, to the extent that it can show that the receivables either were themselves acquired by NFA prior to May 21, 1988, or else were proceeds of either contract rights or inventory acquired by NFA prior to that date. The United States has a secured claim in the receivables, entitled to adequate protection, to the extent that the Bank cannot make this showing. The United States also has a secured claim (1) in the inventory of NFA on June 22, 1988, to the extent that the Bank cannot show that this inventory was acquired by NFA prior to May 21, and (2) in the contract rights acquired by NFA after May 21. To the ex-

tent of its secured claim, the tax lien of the United States attaches to all property acquired by NFA post-petition except for that after-acquired property that is proceeds of the Bank's collateral, as to which the Bank's security interest attaches. NFA is required to obtain the consent of both the Bank and the United States before using any cash it acquires, since this cash will be subject to the security interests of these parties.

Based on these conclusions, the Bank, the IRS, and NFA may be able to agree on the extent of the secured claims of the Bank and United States and on the adequate protection that NFA should provide in order to continue to use its accounts receivable and cash collateral. In the event the parties are not able to agree, the court will resolve these matters at a hearing.

---

Revenue Code. In order to overcome that showing, the Bank must establish the priority of its interests, over the tax lien, pursuant to

§ 6323. *See Donald v. Madison Industries, Inc.,* 483 F.2d at 845.