612 N.W.2d 488 (2000)
259 Neb. 808
ALLIED MUTUAL INSURANCE COMPANY, appellee and cross-appellant
v.
MIDPLAINS WASTE MANAGEMENT, L.L.C., et al., appellees, and State of Nebraska, appellee and cross-appellant, and United States of America, Internal Revenue Service, appellant and cross-appellee.
No. S-99-595.
Supreme Court of Nebraska.
June 23, 2000.
*492 Loretta C. Argrett, Assistant Attorney General, William S. Estabrook, Washington, D.C., Tamara W. Ashford, Miami, Florida, and, of Counsel, Thomas J. Monaghan, U.S. Attorney (District of Nebraska), and Paul D. Boeshart, Lincoln, for appellant United States of America, Internal Revenue Service.
Don Stenberg, Attorney General, and William L. Howland, Lincoln, for appellee State of Nebraska.
Jeanelle R. Robson and Trev E. Peterson, of Knudsen, Berkheimer, Richardson & Endacott, Lincoln, for appellee Cedar Security Bank.
*493 Robert B. Lundholm, of Willson & Pechacek, P.C., Council Bluffs, Iowa, for appellee North Central Regional Solid Waste Management Committee.
HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, McCORMACK, and MILLER-LERMAN, JJ.
HENDRY, C.J.

I. INTRODUCTION
The United States of America, Internal Revenue Service (IRS), appeals and the State of Nebraska cross-appeals a judgment in favor of the North Central Regional Solid Waste Management Committee (Committee), determining that the Committee was entitled to the remainder of an interpleader fund established by Allied Mutual Insurance Company (Allied). We moved this case to our docket pursuant to our power to regulate the caseloads of this court and the Nebraska Court of Appeals. See Neb.Rev.Stat. § 24-1106(3) (Reissue 1995).

II. FACTUAL BACKGROUND
Midplains Waste Management, L.L.C. (Midplains), operated a recycling and solid waste processing plant (facility) in the town of O'Neill, which is located in Holt County, Nebraska. George Haase and two other individuals purchased the facility from Arens Sanitation, Inc. (Arens), in February 1995. The land and building which housed the facility was leased from Dowd Grain Co., Inc., of O'Neill.
On June 16, 1994, prior to Haase's purchase of the facility, Arens received a grant in the amount of $201,988 from Nebraska's Department of Environmental Quality (DEQ) for the purchase of four pieces of equipment. The grant funds were used to purchase a compost turner, baler, electromagnet, and skid-steer loader. Arens had issued the checks in payment for the equipment, had been listed as the purchaser on the invoices for each piece of equipment, and had exclusive use and possession of the equipment.
DEQ assigned an expected service life to each piece of equipment. Conditions of the grant required Arens to properly maintain the equipment, submit an annual report to DEQ, and be subject to periodic DEQ inspections during the equipment's service life. If the equipment was no longer used for its original purpose during its service life, the equipment would be redistributed through the DEQ redistribution program. DEQ also had the option to allow the equipment to be sold and to then be entitled to a return of its share of the proceeds. DEQ approved transfer of ownership from Arens to Midplains when Midplains took over the facility.
On June 19, 1995, Midplains executed a promissory note in the amount of $77,789.75 in favor of the Committee. The Committee, composed of 40 towns served by the facility, was established to control a "protection fund" (fund) that had been accumulated for protection of the landfill in the area. While the facility was under the ownership of Arens, an extra fee was charged for garbage collection services which was accumulated into the fund. The fund was to be used in the event that the landfill caused an environmental problem. Arens had not segregated the moneys which were part of the fund from its own accounts. When Midplains took over the facility, Midplains executed a promissory note in favor of the Committee for $77,789.75, the amount accumulated in the fund.
On July 31, 1995, the Committee filed with the Holt County clerk a financing statement and security agreement on the note, with the collateral described as "equipment, machinery and accounts receivable" of Midplains. The Committee's financing statement did not describe the collateral as fixtures, did not indicate that it was to be filed in the real estate mortgage records, did not contain a description of the real estate, and did not include the *494 name of the record owner of the real estate.
On October 10, 1995, Midplains obtained grant funds of $132,000 from the Nebraska Environmental Trust Fund (Trust), which were used to purchase another piece of equipment. The sales invoice listed Midplains as the purchaser of the equipment. Midplains wrote the checks in payment for the equipment and had exclusive use and possession of the equipment. The grant agreement provided that Midplains was not to "sell, lease, transfer, exchange, mortgage or encumber" grant property without approval from the Trust. In the event that the Trust did not approve the proposed transfer or sale, Midplains had the option to repay the value of the grant to the Trust and be "released from all further obligations." If Midplains violated the terms of the grant agreement, the Trust had the right to cancel the funding and/or demand repayment of funds already disbursed.
The United States, through the IRS, had assessed several tax deficiencies against Midplains for various tax periods in 1995 and 1996. Midplains did not pay the deficiencies, resulting in federal tax liens against Midplains' property. Notices of the federal tax liens were filed on July 16, September 24 and 25, and October 10, 1996.
On June 26, 1996, Midplains' facility was destroyed by fire. Midplains was insured under two policies of insurance with Allied. Cedar Security Bank (bank), which had a security interest in the property covered under the policies, was listed as "loss payee" on the policies. The State of Nebraska and the Trust were each listed as "lien holders" on one of the policies. Allied determined that it would pay proceeds in the amount of $675,000 under the policies.
Several parties asserted competing claims on the insurance proceeds. On October 28, 1997, Allied filed an interpleader action requesting that the court determine which of the various parties were entitled to the proceeds. Allied deposited the $675,000 in insurance proceeds into an interpleader fund.
The parties agreed that the bank had first priority in the interpleader fund in the amount of $661,818.70 by virtue of the bank's security interest in Midplains' property. Several of the other claimants were dismissed from the case, leaving the IRS; the Committee; and DEQ and the Trust (collectively State) as the remaining claimants. The case was tried to the court to determine who among these claimants should be awarded the remainder of the interpleader fund. At the time of trial, there was approximately $20,800 remaining in the interpleader fund. The individual claims asserted by each of these claimants exceeded the amount remaining in the interpleader fund so that the claimant found to have first priority would be entitled to all of the remaining funds.
On March 30, 1999, the trial court determined that the Committee was entitled to the remainder of the interpleader fund because it had a valid fixture lien. The court found that the insured items were fixtures and determined that the Committee had a valid fixture lien by filing the financing statement with the Holt County clerk on July 31, 1995. The court determined that because the Committee's fixture lien was first in time, it had priority over the IRS tax liens, all of which were filed subsequent to the Committee's Holt County filing.
The trial court determined that the State had no lien interest in the insurance proceeds. The court found that the State had no ownership interest in the property and had no lien on file with respect to the property purchased with the grants. The court further determined that the State did not have an equitable lien on the insurance proceeds because under the grant agreements, the State had only the option of requiring repayment of the grant funds if Midplains sold or transferred the property. In this case, the property had not been sold, but was destroyed by the fire. *495 The court found that the State did not require Midplains to insure the property or require that it be named as loss payee on any insurance policies, did not file a lien, and did not retain a specific property interest in the property purchased with the grant funds. The court concluded that the Committee had priority in the remainder of the interpleader fund in an amount not to exceed $77,789.75.
The IRS now appeals, and the State cross-appeals.

III. ASSIGNMENTS OF ERROR
The IRS claims the trial court erred in determining that the Committee's interest had priority over the federal tax liens.
In its cross-appeal, the State claims, rephrased, that the trial court erred in (1) failing to find that the State owned, held title to, or had an insurable interest in the insured property; (2) determining that the State did not have an equitable lien on the insured property; and (3) determining that the State's ownership or equitable interests were not superior to the Committee's interest and the IRS tax liens.

IV. STANDARD OF REVIEW
An interpleader suit is an action in equity. Citizens' Nat. Bank of Wisner v. McNamara, 120 Neb. 252, 231 N.W. 781 (1930). In an appeal of an equity action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court; however, where credible evidence is in conflict on a material issue of fact, an appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. Cao v. Nguyen, 258 Neb. 1027, 607 N.W.2d 528 (2000).
Regarding a question of law, an appellate court has an obligation to reach a conclusion independent from a trial court's conclusion in a judgment under review. Susan H. v. Keith L., 259 Neb. 322, 609 N.W.2d 659 (2000).

V. ANALYSIS

1. PRIORITY OF FEDERAL TAX LIENS
Pursuant to the Internal Revenue Code, I.R.C. § 6321 (1994), a federal tax lien arises upon the property of a person who neglects or refuses to pay a federal tax liability. See, also, United States v. McDermott, 507 U.S. 447, 113 S.Ct. 1526, 123 L.Ed.2d 128 (1993). The lien normally arises at the time the assessment of unpaid tax liability is made and continues until the tax is paid. I.R.C. § 6322 (1994). See, also, McDermott, supra. Lien priority for purposes of federal law is governed by the common-law principle that "`"the first in time is the first in right."'" 507 U.S. at 449, 113 S.Ct. at 1528.
A federal tax lien imposed by § 6321, however, is not valid against "any purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor" until notice of the federal tax lien has been filed. I.R.C. § 6323(a) (1994). See, also, McDermott, supra. When § 6323 is applicable to a competing state lien, the federal tax lien is deemed to commence no sooner than the filing of the notice. McDermott, supra. For purposes of the "first in time" rule, a competing state lien is in existence only when it has been "perfected" in the sense that the identity of the lienor, the property subject to the lien, and the amount of the lien are established. United States v. New Britain, 347 U.S. 81, 84, 74 S.Ct. 367, 98 L.Ed. 520 (1954). See, also, McDermott, supra. It is a matter of federal law as to whether a lien created under state law has acquired sufficient substance and has become so perfected as to defeat a subsequently filed federal tax lien. U.S. v. Pioneer American Ins. Co., 374 U.S. 84, 83 S.Ct. 1651, 10 L.Ed.2d 770 (1963). A lien is considered perfected for federal purposes when "there is nothing more to be done" to have an enforceable *496 lien. New Britain, 347 U.S. at 84, 74 S.Ct. 367.
The notices of federal tax liens in the present case were filed on July 16, September 24 and 25, and October 10, 1996. The Committee filed the financing statement for its security interest on July 31, 1995, prior to the filing of any of the federal tax lien notices. Thus, if the Committee is a holder of a perfected security interest, its interest would have priority over the federal tax liens.
For purposes of the Internal Revenue Code, the term "security interest" is defined as "any interest in property acquired by contract for the purpose of securing payment ... of an obligation." I.R.C. § 6323(h)(1). A security interest exists when "the property is in existence and the interest has become protected under local law against a subsequent judgment lien arising out of an unsecured obligation." I.R.C. § 6323(h)(1)(A). See, also, 26 C.F.R. 301.6323(h)-1(a)(1)(i) (1996). A security interest is deemed protected against a subsequent judgment lien on the date on which all actions required under local law to establish the priority of a security interest have been taken. 26 C.F.R. 301.6323(h)-1(a)(2)(i)(A).
I.R.C. § 6323(h)(1)(A) explicitly provides that the standard of security perfection is dependent on "`local law.'" Donald v. Madison Industries, Inc., 483 F.2d 837, 841 (10th Cir.1973). If the security interest is sufficiently perfected under state law to be perfected against an unsecured creditor's judgment lien, then it is also perfected for purposes of determining federal tax lien priority. Id. If a state court determines that a lien created under state law is unperfected, this classification is "`practically conclusive'" that the lien is unperfected under the federal standard as well. U.S. v. Security Tr. & Sav. Bk., 340 U.S. 47, 50, 71 S.Ct. 111, 95 L.Ed. 53 (1950). See, also, Walker v. Paramount Engineering Company, 353 F.2d 445 (6th Cir.1965). Thus, we must look to the law of Nebraska providing for perfection of security interests to determine whether the Committee was a holder of a security interest which has priority over the subsequently filed federal tax liens. The IRS contends that its federal tax liens have priority over the Committee's interest with respect to the interpleader fund because the Committee did not properly perfect its security interest under Nebraska law.
The trial court found that the Committee had priority over the federal tax liens because it had a perfected security interest in Midplains' fixtures due to its Holt County filing of July 31, 1995. The Committee's Holt County filing did not perfect a security interest in property other than fixtures because other types of security interests must be filed with the Secretary of State in order to be perfected. See Neb. U.C.C. § 9-401(1)(c) (Reissue 1992). The Committee made no filings with the Secretary of State. Thus, if the Committee did not have a valid fixture lien with respect to the Holt County filing, it could not be a "holder of a security interest" under I.R.C. § 6323(a) because its interest would not be protected under local law against a subsequent judgment lien arising out of an unsecured obligation.
In order to perfect a security interest in fixtures, a financing statement must be filed in the office where a mortgage on the real estate would be filed or recorded which, in this case, is the Holt County register of deeds. See Neb. U.C.C. §§ 9-302 (Cum.Supp.1998) and 9-401. A financing statement filed as a fixture filing
must show that it covers this type of collateral, must recite that it is to be filed for record in the real estate records, and the financing statement must contain a description of the real estate sufficient if it were contained in a mortgage of real estate to give constructive notice of the mortgage under the law of this state.
*497 Neb. U.C.C. § 9-402(5) (Cum.Supp.1996). Furthermore, if the debtor does not have an interest of record in the real estate, the financing statement must show the name of a record owner. Id.
The Committee's financing statement contained none of the information required under § 9-402 for a proper fixture filing. The financing statement described the collateral as "equipment, machinery and accounts receivable of Midplains Waste Management L.L.C.," but did not describe the collateral as fixtures. The financing statement did not recite that it was to be filed in the real estate records, did not contain a description of the real estate, and did not show the name of a record owner of the real estate. The Committee's financing statement was deficient because it did not include any of the required information.
The Committee claims that it had substantially complied with the requirements of a fixture filing, pursuant to § 9-402(8), which provides, "A financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading." However, this case does not merely involve a financing statement which contained "minor errors." This financing statement does not contain any of the additional information required for a financing statement to constitute a valid fixture filing. To find that the Committee's financing statement substantially complied with the filing requirements would be to effectively write the fixture filing requirements out of the statute. See Southwest Bank of Omaha v. Moritz, 203 Neb. 45, 277 N.W.2d 430 (1979).
The Committee claims that the IRS was not misled by the Committee's filing and that the IRS' interest was not harmed by the Committee's filing. However, the test of substantial compliance is not whether a particular party was actually misled to its detriment by the irregularities in a financing statement, but "`"whether or not a `reasonably diligent researcher' would be misled by the irregularity."'" Brams Ltd. v. Elf Enters., 253 Neb. 932, 937, 573 N.W.2d 139, 142 (1998). See, also, Lindsay v. First National Bank, 211 Neb. 285, 318 N.W.2d 275 (1982); Mid-Amer. Dairymen, Inc. v. Newman Grove Co-op. Creamery Co., Inc., 191 Neb. 74, 214 N.W.2d 18 (1974). The Committee's financing statement does not provide the information required to put a reasonably diligent researcher on notice of a security interest in fixtures with respect to this real estate. The financing statement did not indicate that it was to be filed with the real estate records. The Committee's financing statement does not substantially comply with the filing requirements for a fixture filing.
Based on our de novo review, we find that the Committee did not have a perfected security interest in fixtures that would take priority over the subsequently filed federal tax liens. Even though the Committee's interest arose before the notices of federal tax liens were filed, the Committee's interest does not have priority over the federal tax liens. The Committee does not have an interest protected under local law against a subsequent judgment lien arising out of an unsecured obligation because it failed to file an effective fixture filing. The trial court erred in finding that the Committee's interest had priority over the federal tax liens.

2. STATE'S CROSS-APPEAL
The State claims that the federal tax liens do not have priority over the State's interest in the interpleader fund for the following reasons: (1) the State owned and held title to the property, (2) the money paid under the insurance policies was not "proceeds" under the U.C.C., (3) the State was listed as a "lienholder" on one of the insurance policies, and (4) the State had an equitable lien on the property.

(a) Ownership Interest
The State first claims that the trial court erred by failing to recognize that the State "owned and held title to the *498 insured property." The State claims that Midplains did not own the property and that therefore, the tax liens could not attach to the insurance proceeds resulting from the destruction of the property.
To support its contention that the State held title to the property, the State relies on a letter from DEQ with a date stamp of August 7, 1995, and the terms of the 1995 trust grant agreement. The State focuses on language in the DEQ letter stating that DEQ "will relinquish interest in the equipment once the expected service life expiration date is reached." However, this does not establish that the State owned or held title to the property. The only "interest" the State had in the property under the DEQ grant was the right to inspect the property or redistribute the property if Midplains no longer used the equipment for the purposes intended under the grant.
With respect to the grant from the Trust, Mary Harding, executive director of the Trust, testified that the Trust's grant agreement did not specify that the State held title to the equipment purchased with the grant. The Trust grant agreement gave the State a right to cancel the funding and/or demand repayment of funds already disbursed if Midplains violated the terms of the trust agreement. In the event that the Trust did not approve a proposed transfer or sale, Midplains had the option to repay the value of the grant to the Trust and to be released from all further obligations. The trust grant agreement does not establish that the State held title to the property.
The terms of both grants are simply restrictions on Midplains' use of the property and do not show that the State itself owned or held title to the property. The terms of the grants gave the State only the right to recover the property if it was no longer used for the purposes of the grant, or the option of requiring Midplains to repay the grant if Midplains desired to sell the equipment without the State's permission. Midplains used the equipment for grant purposes and did not sell the equipment. Instead, the equipment was destroyed by the fire. The terms of the grants have no provisions regarding accidental destruction of the property, and the State did not require Midplains to insure the property. The State's contention that it owned the property is not supported by the record.

(b) Proceeds
The State next claims that the federal tax liens could not attach to the interpleader fund because the money paid under the insurance policy was not "proceeds" under Neb. U.C.C. § 9-306 (Cum. Supp.1996). The State claims, citing Terra Western Corp. v. Berry and Co., 207 Neb. 28, 295 N.W.2d 693 (1980), that proceeds of an insurance policy covering destroyed property do not become "`proceeds'" within the meaning of the U.C.C. until the money is received by "`the owner.'" Brief for appellee on cross-appeal at 5. The State asserts that because the insurance money was never received by Midplains, but was instead deposited into an interpleader fund, the money was never received by the owner and thus never became proceeds.
However, whether the insurance payment constituted proceeds under article 9 of the U.C.C. is not determinative of the issue as to whether the federal tax liens could attach. The right of the United States to enforce its liens does not depend on state law regulating the rights of creditors generally. Broday v. United States, 455 F.2d 1097 (5th Cir.1972); United States v. Overman, 424 F.2d 1142 (9th Cir.1970). A federal tax lien attaches to the delinquent taxpayer's "property and rights to property." I.R.C. § 6321. The insured property upon which the insurance money was paid was property of Midplains. The insurance money was clearly paid as a result of the destruction of Midplains' property. Furthermore, the State itself argues that article 9 is not applicable to the transaction between the State and Midplains. Whether the insurance money *499 became "proceeds" under article 9 is not relevant for purposes of determining whether the federal tax liens attached.

(c) Lienholder
The State claims it has a right to the insurance proceeds because it was listed as a lienholder on one of the insurance policies. However, the record shows that no lien was ever filed by the State in regard to either of the grants. Furthermore, a lienholder generally has no claim to the benefit of fire insurance proceeds unless the lienholder is named as a loss payee or the policy has otherwise been assigned to the lienholder. Calvert Fire Ins. Co. v. Environs Development Corp., 601 F.2d 851 (5th Cir.1979). The State's contention that it is a lienholder entitled to the insurance proceeds is without merit.

(d) Equitable Lien
The State next claims the trial court erred in determining that it did not have an equitable lien on the property that was superior to both the Committee's interest and the federal tax liens. The State claims that the State's equitable lien was the "first in time" event and that thus, the State has priority in the interpleader fund.
An equitable lien is a right, not recognized at law, to have a fund or specific property, or its proceeds, applied in whole or in part to the payment of a particular debt or class of debts. Schroeder v. Ely, 161 Neb. 252, 73 N.W.2d 165 (1955). It is not an estate or property in the thing itself, nor is it a right to recover the thing; that is, it is not a right which may be the basis of a possessory action, but it is merely a charge upon it. Id.
The State did not have an equitable lien on the property purchased with the grant funds. An equitable lien arises when there is a right to have proceeds applied "`to the payment of a particular debt or class of debts.'" Id. at 262, 73 N.W.2d at 171. In this case, Midplains did not owe a debt to the State. Midplains was granted these funds to purchase equipment and had no obligation to repay the funds as long as it complied with the terms of the grants. There is no cognizable debt to serve as the basis of a lien. Further, an equitable lien is not "a right to recover" the property. Id. As discussed previously, the terms of the grants gave the State only the right to recover the property if it was no longer used for grant purposes or to recover the funds if Midplains sold the property without the State's permission, neither of which occurred in this case. The State did not have an equitable lien giving it priority in the interpleader fund.
The State did not have an interest in this property that would entitle it to priority over the federal tax liens. As the trial court correctly noted:
The State made an affirmative decision not to require the grantee to insure the property, not to require that the State be named a payee of insurance proceeds, not to define or retain a specific property interest in property purchased with grant funds, and not to file a lien. The State designed the terms of the grant and could have specified a property interest or a lien, if it chose.
The State's assignments of error are without merit.

VI. CONCLUSION
The trial court erred in determining that the Committee had a perfected security interest in fixtures that had priority over the subsequently filed federal tax liens. The trial court's determination that the Committee had priority in the interpleader fund is reversed.
The trial court correctly determined that the State did not own or hold title to the insured property and that the State had no interest that would entitle it to priority in the remainder of the interpleader fund. The trial court's decision with respect to the issues raised in the State's cross-appeal is affirmed. Thus, we affirm in part, and in part reverse, and remand with *500 directions to the trial court to enter judgment consistent with this opinion.
AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED WITH DIRECTIONS.
STEPHAN, J., not participating.